**NEW ORLEANS & NORTHEASTERN RAILROAD COMPANY**

v.

**The UNITED STATES.**

No. 50184.

United States Court of Claims.

Jan. 31, 1956.

Seddon G. Boxley, Washington, D. C., for plaintiff.

Paris T. Houston, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

This case presents the issue of whether the class rate or the commodity rate was applicable to a shipment of jeeps which moved over the lines of plaintiff and connecting carriers in August 1945 from Toledo, Ohio, to New Orleans, Louisiana, crated for export.

At the time the shipments were made there was in effect Item 43785 of Consolidated Freight Classification No. 16, which provided that the first-class rate applied on shipments of passenger motor vehicles, either loose or in packages, when shipped in carload lots, with a minimum weight of 10,000 pounds. The first-class rate on shipments from Toledo to New Orleans was $1.70 per hundred pounds, as published in Agent B. T. Jones' Tariff No. 548–C.

At the same time there was also in effect Supplement 13 to Agent B. T. Jones' Freight Tariff No. 548–C, which set forth a commodity rate applicable to automobiles shipped from Ohio to New Orleans. The commodity rate provided for in this tariff was 70 cents per hundred pounds on automobiles and automobile parts, boxed.

It is plaintiff's position that since these jeeps were crated and not boxed the class rate of $1.70 per hundred is applicable and that plaintiff therefore is entitled to recover on the basis of transportation at that rate.

It is defendant's position that the word "boxed," as used in the commodity tariff, includes the containers in which the jeeps were shipped and that accordingly it was entitled to have the jeeps shipped at the rate provided for in that tariff.

From an examination of the several tariffs and a study of the evidence offered by both parties, it seems clear that the rate of 70 cents per hundred pounds, as set out in Supplement 13 to Tariff 548–C, was applicable to these shipments.

To begin with, it should be noted that the class rate was a general rate which applied to the shipment of automobiles both loose and in packages, provided that the minimum weight of the shipment was 10,000 pounds. It would appear that this general rate was designed, in part, to insure that the carrier would receive a return of not less that $170 per carload on a shipment of automobiles without regard to whether the vehicles were packaged or loaded loose in the cars.

On the other hand, it appears equally clear that Supplement 13, which specified the commodity rate, was issued to provide a lower rate when the vehicles were shipped in containers that could be easily loaded and unloaded and which reduced the chances of loss to the carrier from breakage, theft, etc. At the same time, this tariff assured the carrier of a fair return on the traffic, because the commodity rate was applicable only to shipments having a minimum weight of 30,000 pounds.

We find several provisions in Supplement 13 which lead us to the conclusion stated above. As shown in our finding 5, Note F of the commodity description in Supplement 13 refers to "boxing or crating" and to "boxed or crated," leaving the inference that these terms are used synonymously.

One of the exceptions to the application of the commodity rates was Item 180 entitled "Transportation of Automobiles" and it stated—

"The rates on Automobiles, boxed or crated, to Gulf ports for export, apply *only* when Automobiles so boxed or crated can be handled through the car doors."

This language creates a strong inference that the use of the word "boxed" in the commodity description also includes the word "crated" and further indicates that at least one purpose of the tariff was to provide for a type of shipping container that could be handled by the carrier without difficulty.

The illustrations and descriptions of the so-called boxes and crates in the record show that they had the same handling and shipping characteristics, were about the same size, and were otherwise similar in all respects, except that the sides and ends of the so-called crates were not completely sheathed.

Every consideration which caused the reduced rate for automobiles shipped in boxes applied equally to those shipped in crates. We quote the following from the testimony of Mr. Marks, a witness for the plaintiff, who states the reason for the difference in the rates:

"62. X Q. If you take the same vehicle, you take a jeep, and consider whether or not to put it under one rate or another, considering whether or not it is boxed or to be shipped openly, without any packaging, the main consideration, then, in fixing those rates is whether the jeep, as boxed, is easier to handle, is not fragile, will not be liable to cause loss to the railroad, either by theft or by breakage, and so forth.

"That would be your consideration in setting a boxed rate, where you have originally a class rate for a jeep? A. That is right. This rate was materially reduced in consideration of the fact that it was going to be boxed.

"63. X Q. And part of that consideration was that you could load a much heavier load on one railway car? A. That is right.

"64. X Q. And the railroad is to be paid per hundred pounds? A. The rate is in cents per hundred pounds.

"65. X Q. And further consideration there also is the fact that when boxed they can be piled up and you can ship many more jeeps on

one car? A. That is right. In handling automobiles unboxed we actually have to provide a special loader. We have the Evans loaders, where you can put four vehicles in a car and protect the cargo."

The main reason for using crates instead of boxes was that the crates could be reused whereas the original boxes could not well be reused, and the additional fact that there was less trouble from moisture when boxed in such a way as to contain openings. The so-called crates, as shown by the illustrations in the record, have the same characteristics as the boxes. The so-called crate is just as easy to handle; can be loaded through the car door and, because it was reinforced, was stronger. It could be shipped with about 40 pounds additional load to the crate which made it more, rather than less, advantageous to the railway company in respect to the revenue to be derived. One of the advantages to the boxes was that they could be stacked in such a way as to haul a greater load. Exactly the same advantages apply to the so-called crates.

It was repeatedly testified by the experts that the bulk, density, the value, packing or loading requirements, the fragility or liability to damage, the risk of handling—whether it is dangerous to itself and other freight, or whether it has inherent dangerous qualities—are among the important considerations in establishing a freight rate schedule.

Prior to 1942 only boxes were used for export shipments of this character and the Army referred to the containers as export boxes, but in 1942, after the Forest Products Laboratory of the Department of Agriculture prepared specifications on shipping containers, the wooden containers in which jeeps were shipped for export were designated as crates by the Army, regardless of whether or not the package was fully sheathed. After 1942 the Army continued at all times to designate both types of containers as crates. In large shipments the shippers usually prepare the bills of lad-ing. In fact, the Government had a standard form and after the change the Government referred only to crates to cover both types of containers.

When these facts are considered in connection with the exceptions to application of rates which we quoted earlier in the opinion, and which refers to automobiles shipped boxed or crated, it seems manifest that the 70 cent rate should be applied.

The terms boxes and crates are sometimes used rather loosely as indicated in the dictionary definition, but generally speaking a box, in common parlance, is thought of as a completely enclosed structure, while a crate is thought of in the public mind as one that is not completely sheathed, but has strips at one end or the other, or on some part of the container.

■ Even if it could be argued that the word "boxed" should not be construed as technically including the term "crate," it must be said that the language of the commodity tariff (set out in our finding 5) is ambiguous when considered in its entirety. Since the carrier prepared the tariff, any doubtful meaning must be resolved against it. Burrus Mill & Elevator Co. v. Chicago, Rock Island & Pacific Railroad Co., 10 Cir., 131 F.2d 532.

■ Since in the shipment of jeeps every characteristic is found in the so-called crate as is found in the so-called box, and since all of the advantages to the railway company, both from the standpoint of ease in handling and of revenue and profit are found alike in both the box and the crate, and since the method of handling is substantially the same with any advantage being in favor of the crate rather than the box, and since all of the considerations that went into the establishment of Supplement 13 are present in the shipments in question, we find that the rate of Item 450–A, Supplement 13, which provides a rate of 70 cents per hundred pounds, was applicable on the shipments in question.

The parties have stipulated that if the $1.70 per hundred rate should be applied, the plaintiff is entitled to recover $41,258.53, and that if Supplement 13 is made applicable, plaintiff has been overpaid in the sum of $3,027.76 on the shipments in question.

We find that plaintiff is not entitled to recover and that defendant is entitled to recover the sum of $3,027.76 overpayment on these shipments.

It is so ordered.

LARAMORE, MADDEN, WHITAKER, and LITTLETON, Judges, concur.

### Findings of Fact

The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner Wilson Cowen, makes findings of fact as follows:

1. Plaintiff is a corporation organized and existing under the laws of the State of Louisiana, and now is and was during all the times hereinafter mentioned, engaged as a common carrier by railroad in the transportation of passengers and freight for hire in interstate and intrastate commerce.

2. Plaintiff's lines of railroad connect with the lines of other common carriers by railroad engaged in interstate and intrastate commerce, and at all times hereinafter mentioned the rates and charges for the transportation services of plaintiff and its connecting carriers were duly published in tariffs lawfully on file with the Interstate Commerce Commission.

3. During the month of August 1945, plaintiff and its connecting carriers transported a large number of motor vehicles, commonly known as jeeps, for defendant from the Rossford Ordnance Depot in Toledo, Ohio, to New Orleans, Louisiana, for export.

Defendant's Exhibit 1 consists of six bills of lading which are typical of the bills of lading under which these shipments were made. On each bill of lading the vehicles transported were described as "9 Crts Freight Autos GI Truck ¼ T." In some instances this description on the bill was followed with the words "Crated for Export". Each bill stated that the vehicles were for export.

4. At the time the shipments involved here moved, there was in effect Consolidated Freight Classification No. 16 which was also entitled "Official Classification No. 60". It listed numerous articles and gave the specific classification rating for each article, both for carload and for less than carload lots. Item 43785 of Consolidated Freight Classification No. 16 specified that the first-class rate applied to the shipment of motor vehicles described as "Passenger, including ambulances or hearses, loose or in packages", when shipped in carloads, minimum weight of 10,000 pounds. The first-class rate applicable to such shipments from Toledo, Ohio, to New Orleans, Louisiana, was $1.70 per hundred pounds and was published in Freight Tariff No. 548–C, ICC No. 3872, which was issued March 10, 1944, and became effective April 20, 1944. This tariff published rates applicable to classes and commodities shipped from Ohio and other midwestern states to Gulf ports for export to foreign countries.

5. At the time of the shipments in issue, there was also in effect Supplement 13 to Freight Tariff 548–C, which carried a commodity rate applicable to automobiles, as therein described, shipped for export from Toledo, Ohio, to New Orleans, Louisiana. Item 450–A of this tariff provided for a rate of 70 cents per hundred pounds on the following:

"Automobiles, freight or passenger, boxed;

"Automobile Bodies, freight or passenger, boxed;

"Automobile Body Parts, boxed;

"Automobile Chassis, freight or passenger, with or without seat cabs, boxed;

"Automobile Chassis Parts, boxed;

"In straight or mixed carloads, minimum weight 30,000 pounds (See Note F).

"Note F.—Bodies, cargo, open top, without seat cabs, gear frames, dump bodies, stake bodies or wheels with tires may be shipped without boxing or crating. Wheels without tires must be boxed or crated."

At the time pertinent to this case, there was no commodity tariff in effect which published a rate for vehicles specifically described as "automobiles, freight or passenger, crated" or as "automobiles, freight or passenger, in crates."

6. In the class and commodity tariff, Freight Tariff No. 548–C, different packaging requirements were specified for various commodities. For example, Item 815, which covered refrigerators, published a commodity rate for counter or show-case refrigerators in boxes or crates. Item 840, which covered tinplate, provided for a commodity rate applicable to tinplate boxed or in packages. Item 850, which covered the shipment of tobacco, specified a commodity rate for tobacco in hogsheads, tierces, boxes, or cases. On the other hand, a number of the commodities listed in this tariff did not contain any reference to or description of the type of package or container in which the commodity was to be shipped.

7. Under the general heading "Exceptions to Application of Rates" in Freight Tariff No. 548–C, Item No. 180, entitled "Transportation of Automobiles" stated:

"The rates on Automobiles, boxed or crated, to Gulf ports for export, apply *only* when Automobiles so boxed or crated can be handled through the car doors."

8. Freight Tariff No. 548–C, as well as Supplement 13 to Freight Tariff No. 548–C, contained on the title page thereof the following provision:

"Governed, except as otherwise provided herein, by the Official Classification No. 60 * * *."

Official Classification No. 60 is the same as Consolidated Freight Classification No. 16 in which Rule No. 40, entitled "Shipping Containers, Other Than Fibreboard," defined boxes and crates as follows:

"Boxes Other Than Fibreboard or Boxes, Hydraulically Pressed Wood or Cane Fibreboard

"Section 1. (a) Boxes must be made of iron, steel or wood, except as provided in Rule 41, or as provided in Section 1(b), with solid or closely fitted sides, ends, tops and bottoms securely fastened, or

"(b) Of hydraulically pressed wood or cane fibreboard not less than ⅛ inch thick, all ends, sides, tops and bottoms to be framed with wooden strips, stapled or stitched to each panel. Panels exceeding 24 inches must be reinforced at center by wooden strips or cleats.

"Crates

"Section 2. Crates must be made of wood, protecting contents on the sides, ends, top and bottom, and so constructed that freight may be taken in or out of car or vessel within crate. Contents must be securely held within crates, and no part shall protrude. Surfaces liable to be damaged must be fully protected."

Rule 41, mentioned as an exception in the above-quoted description, is not relevant here as it deals with solid or corrugated fibreboard containers—not with wooden boxes.

9. Rule No. 5 of Consolidated Freight Classification No. 16 was entitled "Basis for Charges on Shipments not Complying with Classification Requirements." Section 4 of this rule provided as follows:

"Section 4. When articles are found in transportation, which do not comply with the foregoing requirements, the following method of determining the freight charges will govern, but this section shall not be construed to provide rates or ratings and should not be used as a basis for quoting rates in advance of shipment:

"(a) When the container used is of the kind specified but fails to conform to the regulations as to construction, material, packing, closing, sealing or any other regulations or requirements as provided in the separate descriptions or in Rules 40 and 41, or when the article shipped is not required to be in a container but in the separate descriptions of articles, specific regulations are provided for such form of shipment and the article is shipped in the manner specified but without full compliance with the specific regulations provided, the freight charges will be 20% on LCL or any quantity and 10% on CL higher (greater) than provided for the same articles shipped in conformity with the specific regulations.

"(b) When articles are in containers of a kind or a shipping form of a kind, which is not specifically provided for in the description for such articles, the freight charges shall be assessed on the following basis:

"When Shipped      Freight charges
                         will be

"Articles, Dry
   or Solid:
*     *     *     *     *     *

"In crates......20% higher LCL or any quantity and 10% higher CL than in barrels or boxes, whichever is higher (greater). *  *  *"

10.   Prior to 1942, jeeps exported by the Army were packaged in a container designed by the Willys-Overland Company. This container was a fully sheathed wooden box, and until sometime in 1942 it was known in Army nomenclature as an export box. In 1942, after the Forest Products Laboratory of the Department of Agriculture began preparing specifications on shipping containers, the wooden containers in which jeeps were shipped for export were designated in Army nomenclature as crates, regardless of whether or not the package was fully sheathed.

When the jeeps involved here were shipped, there were two separate sets of instructions for packaging jeeps for export. Amendment 1 to O. P. C. Instructions No. 81-1, in evidence as Defendant's Exhibit 2, was issued January 31, 1945. It outlined the export packing procedure for jeeps. Although the drawings in this book of instructions labeled the shipping container a crate, the drawing on page 22 of Defendant's Exhibit 2 shows that the container was a fully sheathed, wooden box reinforced with iron at the corners.

O. P. C. Instructions No. 114-3, issued December 27, 1944, and revised March 16, 1945, contained export packing instructions for shipping the jeep in a container, which was called a reusable crate. These instructions, in evidence as Defendant's Exhibit 3, were issued in recognition of the need for a container which could be reused. It was constructed so that the vehicle could be removed from it without damaging or destroying the crate. Unlike the container provided for in Defendant's Exhibit 2, it was not fully sheathed on the sides or at either end. However, it was 48 pounds heavier and was stronger than the fully sheathed container. The container illustrated in Defendant's Exhibit 3 had a heavy 2 feet by 4 feet framing around the top and was reinforced at the corners and joints by metal. The openings in the sides and at the ends are illustrated by the drawings on pages 30 and 31 of Defendant's Exhibit 3, and pictures of such containers, fully packed, appear in Plaintiff's Exhibits 2 and 3. Taking into account the partial sheathing outside and the triangular bracing inside this container, it had a number of openings about 18 inches high and 8 inches wide on the sides and at either end. The top and bottom were completely sheathed.

Aside from the differences indicated above, the two containers described in Defendant's Exhibits 2 and 3 were approximately the same size, and the

sheathing used on both was about the same thickness. Both containers had the same shipping and handling characteristics.

11. All of the jeeps packed for overseas shipments by the Army were shipped in either one or the other of the two types of containers described above. Although the bills of lading do not show which container was used for the shipments of the jeeps involved in this case, the evidence establishes that the fully sheathed container specified in Defendant's Exhibit 2 was not used for shipping jeeps for export after 1944. Therefore, it is concluded that the jeeps transported by plaintiff were packed in the partially sheathed container illustrated in Defendant's Exhibit 3 and in Plaintiff's Exhibits 2 and 3.

12. Freight Tariff No. 548–C remained in effect until after the shipments in issue were made. Freight Tariff No. 548–D, which was issued June 24, 1946, and became effective July 30, 1946, cancelled Freight Tariff No. 548–C. In Freight Tariff No. 548–D the commodity description of automobiles, freight or passenger, included the word "crated" along with the word "boxed." This change in the tariff was made by the carriers at the request of the War Department.

13. The parties have agreed that if the first-class rate of $1.70 per hundred pounds, as published in Consolidated Freight Classification No. 16 and Freight Tariff No. 548–C, is applicable to the shipments in issue, plaintiff is entitled to recover $41,258.53. The parties have also agreed that if the commodity rate of 70 cents per hundred pounds, as set forth in Supplement 13 to Freight Tariff No. 548–C, is applicable, plaintiff has been overpaid the sum of $3,027.76 on such shipments.

### Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and that defendant is entitled to recover.

It is therefore adjudged and ordered that the defendant recover of and from the plaintiff the sum of three thousand twenty-seven dollars and seventy-six cents ($3,027.76).